## COMMISSIONER OF INTERNAL REVENUE v. TEN EYCK.
### No. 274.

Circuit Court of Appeals, Second Circuit.
April 1, 1935.

Frank J. Wideman, Asst. Atty. Gen., and Sewall Key and A. F. Prescott, Sp. Assts. to Atty. Gen., for petitioner.

John C. Watson, of Albany, N. Y. (Laurence Graves, of Washington, D. C., of counsel), for respondent.

John J. Bennett, Jr., Atty. Gen., Henry Epstein, Sol. Gen., of New York City, for the State of New York.

T. Harry Rowland, of Camden, N. J., and Harold D. Saylor, of Philadelphia, Pa., for Delaware River Joint Commission.

Julius Henry Cohen, of New York City, Gen. Counsel for The Port of New York Authority.

Wendell P. Brown, of Albany, N. Y., Wilbur LaRoe, Jr., of Washington, D. C., Austin J. Tobin and William A. Pallme, both of New York City, and Charles E. Goldberg, on the brief, amici curiæ.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge.

Respondent is the chairman of the Albany Port District Commission, and the petitioner seeks to tax his salary received for the year 1930, under the Revenue Act of 1928 (45 Stat. 791), 26 USCA § 2001 et seq. The Board of Tax Appeals held that his income was exempt because it was a salary paid by the state of New York to a state officer, for services rendered in the performance of an essential governmental function.

The questions presented are whether the Albany Port District Commission was performing a usual governmental function, and whether immunity extends to those functions exercised by the state, or its political subdivision, in connection with a power claimed by petitioner to be relinquished to the federal government under the Constitution.

The Albany Port District was a public corporation, organized pursuant to an act of the New York Legislature. Laws New York 1925, c. 192; Laws New York 1927, c. 523; Laws New York 1929, c. 293; Laws New York 1932, c. 631; Laws New York 1933, c. 406. The District included the cities of Albany and Rensselaer and all lands and waters in the Hudson river contiguous thereto, subject to the right of the state in and to the lands under the waters of the Hudson river. An administrative Commission for the District, consisting of five members, was appointed by the Governor, the members taking the constitutional oath of office.

The District and Commission were established as a result of recommendations made by the United States Board of Army Engineers, which recommendations resulted in the provision in the Rivers and Harbors Act of March, 1925 (43 Stat. 1186), of a national appropriation of $11,000,000 to provide a deep navigable channel in the Hudson river, from Albany, at the eastern terminus of the New York State Barge Canal, to the Atlantic Ocean. This appropriation and authorization were conditioned upon the erection of a District and of a governing agency to provide Port facilities satisfactory to the Chief Engineers and the Secretary of War, at an initial cost of $5,600,000. The state of New York memorialized Congress to approve this project, and the cities of Albany and Rensselaer obligated themselves to meet the requirements of the federal government and expended more than the estimated cost of the initial development. It required a public agency or instrumentality to carry out the enterprise. The state has contributed upwards of $175,000,000 for the construction of the Barge Canal System, connecting with the facilities at the Port of Albany, which is the point of interchange, or junction, between the deepened water navigation of the Hudson river and the Barge System. See Report No. 952, Rivers & Harbors Act, March 3, 1925. It was the desire of the citizens of the state of New York to improve the navigable rivers within the state confines, and this expenditure primarily was for the carrying out of this purpose. It aided and assisted the development of the state by making remote portions thereof available for commerce and navigation. It likewise served and assisted the Middle West and New England. It required the action by the state, as such, to effect this result.

The powers conferred upon the Commission, by the state, to promote the commerce

and the industrial welfare of the state, were very broad. The act creating the District provided for its perpetual existence as a public corporation. It declared that the District was created for a public purpose; that the members of the Commission were to be appointed by the Governor of the state with continuous tenure of office, taking the constitutional oath of office for the duties established by law. The act (chapter 192, Laws New York 1925, §§ 9, 10) authorized the issuance of bonds. It did not provide that these bonds were to be a lien or mortgage upon the specific improvements required by Congress to be carried out by the Port Commission. It did provide that. the cities within the District should raise certain moneys by taxation in their annual budget, and that such costs would be borne by the cities of the District in the proportion that the assessed valuation had to the taxable property. Payment of the bonds was secured by the general taxes of the cities of Albany and Rensselaer, and the proceeds were pledged for the payment of the bonds. Section 10, as amended. The act provides: "the development of such port shall be deemed and is hereby declared to be a public purpose." Section 8, as amended by Laws 1927, c. 523, § 1. The bonds were exempt from transfer and inheritance tax (section 10, as amended). Subsection 15 of section 5, as amended by Laws 1929, c. 293, § 2, provided that "'facilities,' 'port facilities,' 'terminals,' and 'terminal work'" should include "wharves, docks,. piers, terminals, railroad tracks on terminals, cold storage and refrigerating plants, warehouses, elevators, and such property real or personal," as would be used in connection therewith. The Commission did not operate the grain elevator erected thereon but leased it, as it did a molasses mill. It did operate the railroad, and charged rates authorized by the Interstate Commerce Commission. But we think that this terminal was intended as an instrument of government rather than of commerce only. In providing it and operating it, the state of New York was engaged in a usual governmental function as distinguished from a proprietary function.

Port and harbor developments have long been regarded as governmental functions in providing for the welfare and prosperity of the people. In the past, the national government has appropriated large sums of money for the improvement of ports and navigable waters. It has created a Board of Engineers for rivers and harbors to investigate and report on such improvements and to advise and pass upon plans of local authorities in the carrying out of such projects. Act June 13, 1902, § 3, 32 Stat. 372, as amended (33 USCA § 541); Act March 2, 1919, 40 Stat. 1275. Section 8 of the Merchant Marine Act 1920 (46 USCA § 867) has made it the duty of the Shipping Board to co-operate with the Secretary of War in investigating ports and port facilities. They are directed "to advise with communities regarding the appropriate location and plan of construction of wharves, piers, and water terminals."

Nor can the development of port or terminal facilities be classified solely as federal or private functions. There are many instances of State control or control under a state agency, and the statutes contemplate, that the development of harbor and port facilities be mainly in the hands of the states. The federal government has encouraged the upbuilding of ports of the nation by the states themselves. Nothing enacted by Congress or done by the federal government indicates a desire to exclude or restrict state participation in carrying out these projects which were desirable from the standpoint of state governments. On any broad consideration it may reasonably be considered as a usual governmental function of a state.

The essence of port and harbor development is to provide adequate terminal facilities. Historically, port activities have been shown to be almost universally, directly subject to the supervision of agencies of government. Commissions similar to this one, created for purposes of supervision and control of ports, in nearly all instances, have been governmental agencies, so constituted as to exercise the same kind of regulatory and supervisory functions as does the Albany Port District Commission; they either own the whole or a very large part of the water front of the port or haven. Illustrations of these are the Hamburg and Northern European ports.[1] There, the operations are not regarded as a proprietary or profit making activity of the government, and where ports are under the supervision of Port Committees, operated usual-

[1] The Port of Hamburg by L. Wendemuth and W. Böttcher, p. 180; The Port of Rotterdam, Its Growth, Development of Traffic and Facilities, p. 29; Port of Antwerp, published by the Corporation of the City of Antwerp (1929) p. 31.

ly at a loss, or, at best, earning only sufficient operating revenue to meet the cost thereof, and where the committee, as such, controls and regulates the dock facilities and provides for warehouses, ferries, and quays, the facilities are regarded as being under governmental control, operated as a usual function of government. The French ports follow a standardized pattern developed by the central government and are provided for by legislation.[2] This governmental character of the leading port organizations of the continent indicates that in the regulation and development of such ports and harbors the governments treat these functions as essentially governmental in character. The English ports are similarly operated.[3] Intrusting the regulation and operation of terminal facilities of a port to a central public agency is not unusual in England;[4] nor in Scotland.[5] In the Dominion of Canada, it is likewise regarded as a usual governmental function, as illustrated by the operation and development of the Port of Montreal.[6]

The necessity of a comprehensive plan for the organization and development of port facilities in the principal harbors of this country has been recognized, and steps have been taken to vest in the control of properly constituted governmental agencies the future development of many of its ports.[7] A Bi-State Commission was appointed to consider the requirements of New York and New Jersey, clearly an effort within the sovereign prerogatives of the respective states. They joined in an agreement for the creation of a governmental agency and endowed that agency with adequate powers to carry out remedial measures for the alleviation of traffic congestions within, and further development of the facilities of, the Port of New York. It resulted in the creation of the Port of New York Authority.[8] This action was a recognition of the importance, as a governmental desire, of the proper development and operation of the Port of New York.

Other states of the Union have entrusted the development and regulation of port facilities to governmental agencies. The federal government has recognized the need of direct governmental control and operation of port facilities in the Panama Canal Zone, where it operates and controls directly all the piers, wharves, warehouses, and storage facilities both at Colon and at the Pacific terminus of the Canal.

Therefore, it is clear that ownership, control, and operation of port facilities are essentially and usually prerogatives of sovereignty; especially of the sovereignty of the constituent state governments of the United States. In England and in Scotland, the right to erect a port was part of the royal prerogative. No port could exist except under the authority of the sovereign. Hunter v. Northern Mar. Ins. Co., L. R., 13 A. C. 717; Sailing-Ship Garston Co. v. Hickie, L. R., 15 Q. B. D. 580; Yarmouth v. Eaton, 3 Burr. 1402; Gould on Waters (3d Ed.) pp. 11, 12.

The governmental character of public wharves, or piers as well as rights in navigable water and landing places, have been recognized by the courts. Scranton v. Wheeler, 179 U. S. 141, 21 S. Ct. 48, 45 L. Ed. 126; Gibson v. United States, 166 U. S. 269, 17 S. Ct. 578, 41 L. Ed. 996; Shively v. Bowlby, 152 U. S. 1, 14 S. Ct. 548, 38 L. Ed. 331. The paramount governmental importance of port and harbor developments was recognized in Appleby v. New York, 271 U. S. 364, 46 S. Ct. 569, 70 L. Ed. 992. States have been free to legislate concerning the use of navigable waters within the territorial limits of the state in instances in which the United States has not preempted such right of legislation through its power to regulate commerce on such waters. Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23; So. Carolina v. Georgia, 93 U. S. 4, 23 L. Ed. 782; United States v. Bellingham Bay Boom Co., 176 U. S. 211, 20 S. Ct. 343, 44 L. Ed. 437. The interest of the people in navigation on the waters, and commerce

---

[2] Annual Report of the Port Antonome du Havre for 1928, p. 5.

[3] The Port of London Yesterday and To-day, Owen (1927) p. 16.

[4] Port of Liverpool, Its Rise and Progress, published by Mersey Docks and Harbor Board; excerpts reprinted in "English Port Facilities" by Chambers, United States Government Printing Office (1919) appendix, 5.

[5] "English Port Facilities," supra, appendix, 28.

[6] Montreal 1894; See Port Development by MacElwee, p. 52, Harbour Commissioners' Act. 1.

[7] Chapter 426, Laws New York 1917; chapter 130, Laws New Jersey 1917.

[8] Chapter 154, Laws New York 1921; Chapter 151, Laws New Jersey 1921; Plan for the Development of the Port of New York, chapter 43, Laws New York 1922; chapter 9, Laws New Jersey 1922.

over them, with their right to improvements by the erection of wharves, docks, piers, and terminal facilities, has been regarded as creating a duty incumbent upon the state to develop them for the benefit of the people. Illinois Central R. R. Co. v. Illinois, 146 U. S. 387, 13 S. Ct. 110, 36 L. Ed. 1018.

In Helvering v. Powers, 293 U. S. 214, 55 S. Ct. 171, 173, 79 L. Ed. ——, the court gave the fundamental reason for denying federal authority to tax, saying: "That reason, as we have frequently said, is found in the necessary protection of the independence of the national and state governments within their respective spheres under our constitutional system. * * * The principle of immunity thus has inherent limitations. * * * And one of these limitations is that the state cannot withdraw sources of revenue from the federal taxing power by engaging in businesses which constitute a departure from usual governmental functions and to which, by reason of their nature, the federal taxing power would normally extend."

The Commission, in the instant case, a public corporation, maintaining and operating a public port, not for profit, is performing a usual governmental function, and is not withdrawing sources of revenue from the federal taxing power. It has supplanted no private business to which the federal taxing power would normally extend. If a private corporation performs public services for a profit, it cannot be said to be exercising governmental functions simply because of that service. But whenever a state intrusts to, or imposes upon, one of its political subdivisions a governmental function to be exercised by officers or employees in the interest of the public welfare, such officer or employee, engaged in the exercise of such function, is immune from federal taxation. In State of Ohio v. Helvering, 292 U. S. 360, 54 S. Ct. 725, 726, 78 L. Ed. 1307, and South Carolina v. United States, 199 U. S. 437, 26 S. Ct. 110, 50 L. Ed. 261, 4 Ann. Cas. 737, the Supreme Court held that, although the states have the constitutional power to create liquor monopolies within their borders and to conduct the business as a wholly owned state enterprise, they could not thereby remove the business of the purchase and sale of liquors from the taxing power of the federal government. In Ohio v. Helvering, supra, the court said: "If a state chooses to go into the business of buying and selling commodities, its right to do so may be conceded so far as the Federal Constitution is con-

cerned; but the exercise of the right is not the performance of a governmental function, and must find its support in some authority apart from the police power. When a state enters the market place seeking customers it divests itself of its quasi-sovereignty pro tanto, and takes on the character of a trader, so far, at least, as the taxing power of the Federal government is concerned."

It is the entrance into a trade enterprise that distinguishes these cases, relied upon by the petitioner. It cannot be maintained that there is involved in the instant case a trade or business, entered into for profit, constituting a proprietary enterprise. Revenues are not profits, but revenues, like tolls collected from users of a state improvement, are merely means by which the state attempts to recoup in some part its legitimate expenses. Even if the revenues were sufficient to pay back all the outlay of the state and the cities of the Port District for construction of the port's facilities, the amounts over and above would go back into the treasuries of the cities for the reduction of taxation.

In South Carolina v. United States, supra, the court pointed out the distinction between strictly governmental agencies and instrumentalities, and those of a private nature, saying that the thought has been to exempt state agencies and instrumentalities, which are strictly of a governmental character, from national taxation. See also: Metcalf & Eddy v. Mitchell, 269 U. S. 514, 46 S. Ct. 172, 70 L. Ed. 384.

The principle of immunity from state taxation of instrumentalities of the federal government and the corresponding immunity of state instrumentalities from federal taxation, has been consistently recognized. Johnson v. Maryland, 254 U. S. 51, 41 S. Ct. 16, 65 L. Ed. 126; Long v. Rockwood, 277 U. S. 142, 48 S. Ct. 463, 72 L. Ed. 824. Where immunity exists, it rests upon an entire absence of power to tax.

Reference is made to Com'r of Internal Revenue v. Modjeski (C. C. A. 2) 75 F.(2d) 468, Feb. 4, 1935, but that case decided merely that the engineer, who there sought exemption, was an independent contractor, and was therefore not exempt from taxation. To permit a federal tax to be imposed on respondent would be to impose a burden upon a governmental instrumentality exercising a usual governmental function.

Decision affirmed.