## Richmond

### A. S. HARRISON, JR., ATTORNEY GENERAL OF VIRGINIA v. SIDNEY C. DAY, JR., COMPTROLLER OF VIRGINIA.

March 16, 1959.

Record No. 4931.

Present, All the Justices.

The opinion states the case.

*George D. Gibson, Special Assistant to the Attorney General (A. S. Harrison, Jr., Attorney General; Clarence F. Hicks, Assistant Attorney General; George C. Freeman, Jr.; Hunton, Williams, Gay, Moore & Powell, on brief)*, for the petitioner.

*Aubrey R. Bowles, Jr. (Jack N. Herod; Bowles, Anderson, Boyd, Clarke & Herod, on brief)*, for the respondent.

SNEAD, J., delivered the opinion of the court.

■ Pursuant to § 8-714, Code 1950, A. S. Harrison, Jr., Attorney General of Virginia, filed in this court on October 7, 1958 an original petition for a writ of mandamus against Sidney C. Day, Jr., Comptroller of Virginia, to compel him to issue warrants to pay expenses incurred by the Virginia State Ports Authority incidental to the development and operation of port facilities in Hampton Roads.

Under Title 62, Chapter 6.1, Code 1950, as amended, (§§ 62-106.1 through 62-106.19) the Virginia State Ports Authority was established as a body corporate and its powers and duties are there defined. It is provided that such rights, powers and duties shall be exercised by a Board of Commissioners, consisting of seven members appointed by the Governor, subject to confirmation by the General Assembly, who shall serve at the pleasure of the Governor for terms of six years each.

Sections 62-106.7[1] and 62-106.8[2] authorize and empower the

---

[1] Sec. 62-106.7. *"Additional rights and duties of Board.*—Through the Board, the State of Virginia may engage in promoting, developing, constructing, equipping, maintaining, and operating the harbors or seaports within the State, or its jurisdiction, by means of acquiring or constructing, maintaining and operating at such seaports or harbors water craft and terminal facilities necessary or useful in connection therewith. The Authority is charged with the accomplishment of the following general purposes, all or any of them, which are intended to broaden, and not to restrict, any other powers given to it in this chapter, namely:

(a) To develop and improve the harbors or seaports of this State for the handling of water-borne commerce from and to any part of the State of Virginia and other states and foreign countries;

(b) To acquire, construct, equip, maintain, develop and improve such harbors or seaports and their port facilities and to issue revenue bonds for these purposes;

(c) To foster and stimulate the shipment of cargoes and commerce through such ports, whether originating within or without the State of Virginia, including the investigation and handling of matters pertaining to all transportation rates and rate structures affecting the same;

Authority, among other things, to "engage in promoting, developing, constructing, equipping, maintaining, and operating the harbors or seaports within the State, or its jurisdiction, by means of acquiring or constructing, maintaining and operating at such seaports or harbors

(d) To compile and disseminate in a single publication, so far as practicable, all port charges, rules and practices in effect at the several ports in this State;

(e) To co-operate with the United States of America, and any agency, department, corporation or instrumentality thereof, in the maintenance, development, improvement and use of such harbors and seaports;

(f) To accept funds and property from persons, counties, cities and towns, and to use the same in such manner, within the purposes of the Authority, as shall be stipulated by the grantor, and to act as agent or instrumentality for any of such persons, counties, cities or towns in any matter coming within the general purposes of such Authority; counties, cities and towns are hereby authorized to make grants to the Authority for its purposes and to appoint it as agent;

(g) To act as agent for the United States of America, or any agency, department, corporation or instrumentality thereof, in any matter coming within the purposes or powers of the Authority;

(g¹) To issue revenue bonds for the acquisition, construction, reconstruction or control of harbors, seaports and their port facilities;

(h) And in general to do and perform any act or function which may tend to or be useful toward the development and improvement of the harbors and seaports of this State, and to the increase of commerce, foreign and domestic, through its harbors and seaports;

(i) But the Authority shall not be authorized or empowered to expend funds appropriated by the General Assembly on, nor to incur any indebtedness on account of, improvement, repair, maintenance, or addition to real or personal property belonging to anyone other than the Authority or the Commonwealth of Virginia, unless the use of such property is guaranteed to the Authority, or the Commonwealth of Virginia by a lease, extending beyond the useful life of the improvement, repair, maintenance or addition or of any new facility erected thereon."

2 Sec. 62-106.8 *"Further powers.—*In order to enable it to carry out the purposes of this chapter, the Authority, but without pledging the faith and credit of the Commonwealth of Virginia;

(a) Is vested with the powers of a body corporate, including the power to sue and be sued, to make contracts, and to adopt and use a common seal and to alter the same as may be deemed expedient;

(b) Is authorized and empowered to rent, lease, buy, own, acquire, mortgage and dispose of such property, real or personal, as the Authority deems proper to carry out the purposes and provisions of this chapter, all or any of them and to issue revenue bonds for buying or acquiring such property;

(c) Is authorized and empowered to acquire, construct, maintain, equip and operate any wharves, docks, ships, piers, quays, elevators, compressors, refrigeration storage plants, warehouses and other structures, and any and all facilities needful for the convenient use of the same in the aid of commerce, including the dredging of approaches thereto, and the construction of shipping facilities and transportation facilities incident thereto and useful or convenient for the use thereof and to issue revenue bonds for these purposes;

(d) May appoint and employ and dismiss at pleasure such employees as it may select. The Authority may retain legal counsel, subject to the approval of the Attorney General, to represent the Authority in rate cases and all other hearings,

water craft and terminal facilities necessary or useful in connection therewith", and to issue revenue bonds for such purposes without pledging the faith and credit of the Commonwealth of Virginia.

The General Assembly at its 1958 session adopted House Joint Resolution No. 70, which follows:

"Whereas, the continuing development of the ports of Virginia is essential in any program of economic or industrial development of the Commonwealth; and

"Whereas, the commerce moving through Virginia's ports is of proven benefit to the entire State; and

"Whereas, Virginia's ports have achieved their present position of eminence in world commerce with port terminals and facilities at the State's major seaports provided, maintained and operated by private industry; and

"Whereas, Virginia's ports are in competition with ports of other states which have and are now receiving substantial financial assistance from their respective state governments in the construction and acquisition of terminals, piers, and other port facilities; and

"Whereas, the increasing pressure of competition from ports with

---

controversies, or matters involving the interests of the Authority and the furtherance of its duties;

(e) Is authorized to establish and maintain a traffic bureau or other office to investigate and seek improvement in rates, rate structure, practices and charges affecting the Virginia ports so as to increase the commerce of such ports;

(f) Is authorized and empowered to apply for and accept grants or loans of money or other property from any federal agency for any and all of the purposes authorized in this chapter, and to expend or use the same in accordance with the directions and requirements attached thereto or imposed thereon by any such federal agency;

(f1) Is authorized and empowered to issue periodicals and to carry and charge for advertising therein;

(f2) Is authorized to establish and maintain branch offices within and without the State and the United States;

(f3) Is authorized to employ, fix and pay compensation of employees within and without the State and the United States without regard to whether such employees are citizens of the United States;

(f4) Is authorized to issue revenue bonds for the acquisition, construction, reconstruction or control of harbors, seaports and facilities used in connection therewith;

(g) Is vested with power to adopt, alter or repeal its own by-laws, rules and regulations governing the manner in which its business may be transacted and in which the power granted to it may be enjoyed, and may provide for the appointment of such committees, and the functions thereof, as the Authority may deem necessary or expedient in facilitating its business; and

(h) Is authorized and empowered to do any and all other acts and things in this chapter authorized or required to be done, whether or not included in the general powers in this section mentioned."

publicly supported terminals and facilities has made it impossible for private industry to provide the necessary new and improved facilities which Virginia's ports must have if they are to obtain the oceanborne general cargo commerce, potential to them, maintain their present volume of trade or to properly serve Virginia agriculture and industry; and

"Whereas, the Virginia State Ports Authority, in the discharge of its responsibilities for developing and promoting Virginia's ports and their commerce, has recommended a program for general cargo facilities acquisition and construction at Hampton Roads based upon financial investment by the State and private industry which, through force of circumstances, could not be presented to the Governor and the General Assembly for consideration until after the State's budget requirements for other purposes had been largely determined, resulting in the General Assembly being unable to appropriate the money requested to inaugurate the program in the 1958-1960 biennium; now, therefore, be it

"Resolved by the House of Delegates, the Senate concurring, That by reason of the high degree of importance of further port development to the economy of the Commonwealth, the General Assembly of Virginia directs the Virginia State Ports Authority to proceed to obtain facts and information regarding the cost of acquisition and construction of such port terminals and facilities for presentation to the Governor and the General Assembly at the regular session of 1960."

Chapter 642, item 24, of the 1958 Acts of Assembly (Appropriation Act for Biennium 1958-1960) provides that the Governor may, in his discretion, transfer to the Virginia State Ports Authority from his discretionary funds sums not exceeding $50,000 each year of the current biennium to aid the Authority in the development of firm proposals for the acquisition and construction of port facilities for presentation to the General Assembly. The Governor has exercised his discretion and has transferred $50,000 to the Authority.

On October 1, 1958, the Comptroller notified the Attorney General by letter that he entertained doubt as to the constitutionality of Title 62, Chapter 6.1 and especially § 62-106.8(c), since it had been suggested that the powers conferred thereby are violative of the "internal improvement" clause in § 185 of the Constitution of Virginia. He further advised that he would not issue any warrants in payment of obligations incurred until there has been an adjudication

by this court that the statutory provisions are constitutional. Thus the execution of a proposed contract between the Authority and Uhl, Hall & Rich of Boston, engineers, prepared pursuant to House Joint Resolution No. 70, authorizing the firm to make surveys, prepare engineering analyses, and make cost estimates for the acquisition and construction of port facilities at Hampton Roads has been delayed pending the outcome of this proceeding.

The primary issue presented is whether the power sought to be exercised by the General Assembly to own and operate port and harbor facilities as stated in §§ 62-106.7 and 62-106.8, Code 1950, as amended, is prohibited to the State by § 185 of the Constitution of Virginia. Another question presented is whether the statutes in question violate § 188 of the Constitution of Virginia. If these two questions are answered in the negative, then it is apparent that the writ of mandamus prayed for should be awarded.

Section 185 of the Constitution of Virginia provides:

"Neither the credit of the State, nor of any county, city or town, shall be, directly or indirectly, under any device or pretense whatsoever, granted to or in aid of any person, association, or corporation, nor shall the State, or any county, city or town subscribe to or become interested in the stock or obligations of any company, association, or corporation, for the purpose of aiding in the construction or maintenance of its work; *nor shall the State become a party to or become interested in any work of internal improvement, except public roads and public parks, or engage in carrying on any such work;* * * *" (Italics supplied).

Section 188 of the Constitution of Virginia reads:

"No other or greater amount of tax or revenue shall, at any time be levied than may be required for the necessary expenses of the government, or to pay the indebtedness of the State."

The court has been greatly assisted by the able and exhaustive briefs of counsel for both litigants as well as their oral arguments. Petitioner contends that the development and operation of port and harbor facilities is a governmental function which the State is authorized to perform notwithstanding the prohibition of § 185 of the Constitution of Virginia against engaging in "works of internal improvement" by the State, and that since it is a governmental function it is for a "public purpose" and thus is not forbidden by Section 188 of the Constitution. Petitioner further contends that port and harbor facilities are a part of the "public roads" which are

expressly permitted by Section 185 of the Constitution.

Respondent does not question the general desirability of developing and improving the ports and harbors in the State. He does, however, question the constitutionality of the method by which the objectives are sought to be obtained. He maintains that the power to own and operate port facilities in commercial competition is now expressly denied to the State, whether heretofore considered a governmental function or not, and that the power may only be exercised after the prohibition has been removed by a change in § 185 of the Constitution as was done in reference to public roads and public parks in 1902 and 1928 respectively. He asserts there is a fundamental and basic distinction between the inherent functions of government essential to its operation and without which it cannot be carried on and those activities which are wholly unnecessary to the function of government itself; that this undertaking is not such an inherent function of government, and is the kind of evil § 185, adopted by the 1902 Constitutional Convention, was designed to prevent. Respondent also denies that the acquisition, ownership and commercial operation of port facilities as contemplated has ever been or can be considered an integral part of "public roads" which are excepted in the Constitution of 1902.

The General Assembly functions under no grant of power. Unless forbidden by some State or Federal constitutional provision, its powers are plenary. When the constitutionality of an act is challenged, a heavy burden of proof is thrust upon the party making the challenge. All laws are presumed to be constitutional and this presumption is one of the strongest known to the law. As we said in *Almond* v. *Day*, 199 Va. 1, 6, 97 S. E. 2d 824: "* * * It is only where an act is plainly repugnant to some constitutional provision that the courts can declare it null and void. If there be a reasonable doubt whether the act violates the fundamental law, that doubt must be resolved in favor of the act."

The restrictive provisions of § 185 were first made a part of our fundamental law in the Constitution of 1869. There they are set forth as §§ 12, 14 and 15 of Article X. Section 15, the predecessor of that part of § 185 with which we are here concerned, provided: "The State shall not be a party to, or become interested in, any work of internal improvement, nor engage in carrying on any such work, otherwise than in the expenditure of grants to the state of land and other property." Section 15 was revised and rewritten by the Con-

stitutional Convention of 1902 to read: "Nor shall the State become a party to or become interested in any work of internal improvement, except public roads, or engaged in carrying on any such work." It will be seen that the pertinent change was the addition of the phrase "except public roads". In 1928 there was a further revision which added "public parks" as an exception.

The historical background and reasons for the adoption of these restrictive provisions are set forth in some detail in *Almond* v. *Day*, 197 Va. 782, 91 S. E. 2d 660. Briefly stated, prior to the adoption of the Constitution of 1869 the Commonwealth had liberally loaned and advanced large sums of money to various corporations engaged in developing and operating privately owned works of internal improvement, such as canal, turnpike and railroad companies, believing that their successful operations would be of benefit to the State. The result was that obligations of magnitude were incurred and heavy losses suffered by the State. By reason of these circumstances the Constitutional Convention determined that the State should cease lending its support and aid to such undertakings, and leave them to private enterprise.

*Shenandoah Lime Co.* v. *Governor*, 115 Va. 865, 80 S. E. 753 involved the question of whether the State's operation of a lime grinding plant using convict labor was violative of §§ 185 and 188 of the Constitution. It was held that such operations were constitutional. In discussing the term "internal improvement", it was said at pages 871 and 872:

"* * * In using this term in article 185, the late Constitutional Convention must be presumed, according to established rules of construction, to have used the term only in the definite sense and meaning that had attached to it throughout the history of the State. Its meaning as thus defined and understood throughout the legislation of the State, and the decisions of her courts, has included and had reference to the channels of trade and commerce, such as turnpikes, canals, railroads, telegraph lines, including in more recent years telephone lines, and other works of a like *quasi* public character.* * *"

In *Almond* v. *Day*, 199 Va. 1, *supra*, we had before us the question of whether the statutory provision authorizing the State Highway Commission to provide and operate a bus facility for the transportation of passengers through and over the bridge-tunnel project across Hampton Roads was repugnant to the "internal improvement" clause of § 185. There we said at page 7:

"* * * [T]here is nothing in the history of the section [185] to suggest that its purpose was to restrict or limit the State in *the exercise of its governmental functions.* From the origin of the Commonwealth, down to the present time, it has constructed many works of internal improvement which are incidental and necessary to the performance of its governmental functions. Among these are the State Capitol, Supreme Court-Library Building, State office buildings, numerous college buildings and the like. Plainly each of these is a 'work of internal improvement' according to the literal meaning of these words, and yet no one would seriously contend that any of these is within the constitutional prohibition." (Italics added)

In that case we discussed *Shenandoah Lime Co.* v. *Governor, supra,* and at page 8 we made the following observation:

"* * * Nothing was said in *Shenandoah Lime Co.* v. *Governor, supra,* to indicate that the State may not engage in the transportation of passengers if that be necessary and incidental to the performance of a governmental function. Indeed, as has been said, the holding in that case was based upon the principle that the provisions of Section 185 are not restrictive of the State's exercise of its governmental functions."

▌ This brings us to the question of whether the development and operation of port and harbor facilities is a governmental function and thus not prohibited by § 185.

Section 62-106.17 provides:

"The exercise of the powers granted by this chapter shall be in all respects for the benefit of the inhabitants of the Commonwealth, for the increase of their commerce, and for the promotion of their safety, health, welfare, convenience and prosperity, and as the operation and maintenance of the project by the Authority will constitute the performance of essential governmental functions, the Authority shall not be required to pay any taxes or assessments upon the project or any property acquired or used by the Authority under the provisions of this chapter or upon the income therefrom; and the bonds, notes, certificates or other evidences of debt issued under the provisions of this chapter, their transfer and the income therefrom including any profit made on the sale thereof, shall at all times be free and exempt from taxation by the Commonwealth and by any municipality, county or other political subdivision thereof."

Petitioner cites *Commissioner of Internal Revenue* v. *Ten Eyck,* 76 F. 2d 515 in support of his argument that the development and

operation of port facilities is regarded as a governmental function. New York and New Jersey are among those States that have no constitutional prohibition against works of internal improvement. It was said at pages 517 and 518:

"Port and harbor developments have long been regarded as governmental functions in providing for the welfare and prosperity of the people. * * *

\* \* \* \* \* \* \*

"The essence of port and harbor development is to provide adequate terminal facilities. Historically, port activities have been shown to be almost universally, directly subject to the supervision of agencies of government. Commissions similar to this one, created for purposes of supervision and control of ports, in nearly all instances, have been governmental agencies, so constituted as to exercise the same kind of regulatory and supervisory functions as does the Albany Port District Commission; they either own the whole or a very large part of the water front of the port or haven. * * *

"The necessity of a comprehensive plan for the organization and development of port facilities in the principal harbors of this country has been recognized, and steps have been taken to vest in the control of properly constituted governmental agencies the future development of many of its ports. A Bi-State Commission was appointed to consider the requirements of New York and New Jersey, clearly an effort within the sovereign prerogatives of the respective states. They joined in an agreement for the creation of a governmental agency and endowed that agency with adequate powers to carry out remedial measures for the alleviation of traffic congestions within, and further development of the facilities of, the Port of New York. It resulted in the creation of the Port of New York Authority. This action was a recognition of the importance, as a governmental desire, of the proper development and operation of the Port of New York. Other states of the Union have entrusted the development and regulation of port facilities to governmental agencies. The federal government has recognized the need of direct governmental control and operation of port facilities in the Panama Canal Zone, where it operates and controls directly all the piers, wharves, warehouses, and storage facilities both at Colon and at the Pacific terminus of the Canal.

"Therefore, it is clear that ownership, control, and operation of

port facilities are essentially and usually prerogatives of sovereignty; especially of the sovereignty of the constituent state governments of the United States. * * *"

And in *Port of New York Authority* v. *J. E. Linde Paper Co.*, 127 N. Y. S. 2d 155, 158, 205 Misc. 110, it is stated:

"The Port Authority is an arm and agency of the States of New York and New Jersey, and in all of its activities, is engaged in the performance of essential governmental functions. (Citing cases)"

The State of Minnesota has constitutional provisions substantially similar to the provisions contained in §§ 185 and 188 of our Constitution. Both Constitutions forbid the State from engaging in works of internal improvement. By legislative enactment, the Port Authority of Duluth was created. The acts provided for contribution of funds by the State, St. Louis County and the City of Duluth. In *Visina* v. *Freeman*, 252 Minn. 177, 89 N. W. 2d 635, the constitutionality of the acts were challenged on the grounds that State aid to the Authority was repugnant to the provisions of Minnesota's Constitution. The court decided, among other things, that port development was a governmental function and that the statutes providing for State aid to the Authority did not violate the Constitution. There it was said:

"Historically, the establishment and maintenance of ports, at least on the sea, intended to provide terminal facilities for shipping open to all who wish to use them, has been considered universally to be a function of government. Various forms of commissions have been set up to supervise and control port facilities, but whenever they have been engaged principally in establishing and operating an open port furnishing terminal facilities and docking privileges to all who wish to use it, subject to uniform and reasonable rules and regulations, the function has been considered to be a governmental one. * * *"

Thus it is clear that the development and operation of port facilities is a governmental function.

Respondent argues that the State will be engaging in "competitive, commercial enterprise". Assuming that to be true, such competition will be primarily if not entirely with ports and harbors outside of the State, many of which are substantially aided by state or municipal governments. In regard to his contention that only those governmental functions that are inherent and necessary to government and without which it cannot be maintained are not prohibited by §§ 185 and 188, we do not agree. As has been said, in *Shenandoah Lime Co.*

v. *Governor, supra,* the operation of the lime grinding plant by use of convict labor was held constitutional. It is obvious that such an operation was not inherent and necessary to government and without which it could not have been maintained. There were other ways to maintain the public peace and keep the convicts occupied. Moreover, the sale of the ground lime could be classified as a "competitive commercial enterprise" as respondent urges in the present case. Certainly, the development and operation of port facilities are as much a governmental function as is grinding lime by use of convict labor.

■ Since the acquisition, development and operation of port and harbor facilities contemplated at Hampton Roads is a proper governmental function, our conclusion is that the statutes involved are not violative of § 185 of the Constitution of Virginia. It being a governmental function, the appropriation is for a public purpose and not a private purpose, and hence the statutes are not repugnant to § 188 of the Constitution of Virginia. *Shenandoah Lime Co.* v. *Governor, supra,* pp. 874 and 875.

Under these circumstances, it becomes unnecessary to discuss the question of whether or not port and harbor facilities are a part of the "public roads" which are expressly permitted by § 185 of the Constitution.

The writ of mandamus prayed for is awarded.

*Mandamus awarded.*

MILLER, J., dissenting.