OPINION BY JUSTICE ELIZABETH A. McCLANAHAN
 

 Appellants, Old Dominion Committee For Fair Utility Rates ("Old Dominion"), VML/VACO APCO Steering Committee ("VML") and Karen E. Torrent ("Torrent"), challenge in these consolidated appeals of right the decision of the State Corporation Commission ("Commission") upholding the constitutionality of Code § 56-585.1:1. This statute suspended the Commission's biennial base rate reviews for Appalachian Power Company (APCO) and Virginia Electric and Power Company, d/b/a Dominion Virginia Power ("Dominion Power") under Code § 56-585.1 until the years 2020 and 2021, respectively. In reaching its decision, the Commission rejected appellants' argument that Code § 56-585.1:1 violates Article IX, § 2 of the Constitution of Virginia. We agree with the Commission and affirm.
 

 I. BACKGROUND
 

 A. Overview of Electric Rates Regulation in Virginia
 

 This constitutional challenge to Code § 56-585.1:1 arises in the context of the General Assembly's exercise of constitutional and legislative authority over the Commission's authority to regulate the rates electric utility companies charge their customers.
 

 1. Commission's Constitutional Ratemaking Authority
 

 The Commission, while created under the 1902 Constitution of Virginia, was not given constitutional authority to regulate electric
 rates until the passage of the 1971 Constitution of Virginia, under Article IX, § 2, clause 3, which provides: "
 
 Subject to such criteria and other requirements as may be prescribed by law
 
 , the Commission shall have power and be charged with the duty of regulating the rates ... of ... electric companies." (Emphasis added.)
 
 See
 

 Commonwealth v. Virginia Electric & Power Co.
 
 (
 
 VEPCO
 
 ),
 
 214 Va. 457
 
 , 463,
 
 201 S.E.2d 771
 
 , 775 (1974) ;
 
 see also
 

 Elizabeth River Crossings OpCo, LLC v. Meeks
 
 ,
 
 286 Va. 286
 
 , 307-08,
 
 749 S.E.2d 176
 
 , 186-87 (2013). This is the Commission's sole source of constitutional ratemaking authority.
 

 2. Commission's Statutory Ratemaking Authority
 

 Long before the Commission received the above-stated constitutional ratemaking authority, the General Assembly first conferred statutory authority upon the Commission to regulate the rates of electric companies in 1914.
 
 VEPCO
 
 ,
 
 214 Va. at 463
 
 ,
 
 201 S.E.2d at 775
 
 . Until 1999, the General Assembly continued to prescribe the Commission's manner of determining such rates under Chapter 10, Article 2 of Title 56 (former Code § 56-234
 
 et seq.
 
 ) and its predecessor statutes.
 
 Appalachian Power Company v. State Corp. Comm'n
 
 ,
 
 284 Va. 695
 
 , 699,
 
 733 S.E.2d 250
 
 , 252 (2012). "Under this regulatory regime, the rates could be changed following a review initiated by the Commission or upon an application filed by an electric utility," and the Commission was given "broad discretion in selecting the methodology for determining rates."
 

 Id.
 

 In 1999, approximately 28 years after the passage of Article IX, § 2, the General Assembly enacted the Virginia Electric Utility Restructuring Act (former Code § 56-576
 
 et seq.
 
 ), which deregulated parts of the electric utility industry and introduced competition among the providers of electric generation. 1999 Acts ch. 411;
 
 see
 

 Appalachian Power Company
 
 ,
 
 284 Va. at 699-70
 
 ,
 
 733 S.E.2d at
 
 252 ;
 
 Potomac Edison Co. v. State Corp. Comm'n
 
 ,
 
 276 Va. 577
 
 , 580,
 
 667 S.E.2d 772
 
 , 773 (2008). This legislation, as amended, established a transition period to a competitive market beginning in 2001 that "capped" base rates for electric utilities for seven years, during which the Commission had no authority to change base rates except in expressly limited circumstances. 1999 Acts ch. 411; 2004 Acts ch. 827; 2007 Acts chs. 888, 933;
 
 see also
 

 Appalachian Power Company
 
 ,
 
 284 Va. at 699-70
 
 ,
 
 733 S.E.2d at
 
 252 ;
 
 Potomac Edison Co.,
 

 276 Va. at 580-82
 
 ,
 
 667 S.E.2d at 773-75
 
 .
 

 In 2007, the General Assembly ended the deregulation program effective December 2008, and enacted Code § 56-585.1, which established a new regulatory regime. 2007 Acts chs. 888, 933;
 
 see
 

 Appalachian Power Company
 
 ,
 
 284 Va. at 700
 
 ,
 
 733 S.E.2d at
 
 252 ;
 
 Potomac Edison Co.,
 

 276 Va. at
 
 582 n.4,
 
 667 S.E.2d at
 
 774-75 n.4. Code § 56-585.1"reaffirmed the Commission's authority to regulate
 electric utility rates but prescribed certain procedures and methodologies which the Commission must follow in establishing such rates."
 

 Id.
 

 Under the statute, the performance of electric utility companies is reviewed every two years. During this biennial review, "the Commission considers the company's rates, terms, and conditions for the provision of generation, distribution and transmission services for the preceding two years."
 

 Id.
 

 (citing Code § 56-585.1(A) ). Furthermore, "[w]hile the biennial review has some characteristics of the Chapter 10 base rate proceeding, the statute imposes significant limitations on the Commission's discretion in adjusting rates."
 

 Id.
 

 The central limitation is that the Commission may not order a base rate reduction unless it finds that the utility had excess earnings in two consecutive biennial reviews.
 
 Id.
 
 at 700,
 
 733 S.E.2d at
 
 253 (citing Code § 56-585.1(A)(8)(iii) (now Code § 56-585.1(A)(8)(iii) )). Under this regulatory regime, the Commission reviewed and affirmed APCO's base rates in its 2014 biennial review.
 

 Then in 2015, the General Assembly enacted Code § 56-585.1:1, which suspended APCO's biennial reviews until 2020 (to review 2018-2019) and prohibited the Commission from adjusting APCO's base rates for any part of this interim period (the "Transitional Rate Period"), except for possible temporary,
 emergency increases requested by APCO.
 
 [1]
 
 2015 Acts ch. 6. Code § 56-585.1:1 thus effected a four-year base rate freeze for APCO.
 
 [2]
 

 B. Old Dominion's Petition Challenging Code § 56-585.1:1
 

 Old Dominion, an association of large industrial customers of APCO, filed a petition asking the Commission for: (a) a declaratory
 judgment that Code § 56-585.1:1 violates Article IX, § 2 of the Constitution of Virginia and, accordingly, that APCO is required under Code § 56-585.1 to make biennial review filings in 2016 and 2018; and (b) an order directing APCO to make such filings.
 

 In the petition, Old Dominion asserted that even though the Commission's constitutional authority to regulate electric utility rates under Article IX, § 2 is expressly "[s]ubject to such criteria and other requirements as may be prescribed by law," this provision does not grant to the General Assembly the power to transfer the Commission's ratemaking authority to itself. While giving the General Assembly "wide latitude to determine the standards that must be used by the Commission in regulating rates," according to Old Dominion, "the Constitution reserves for the Commission-and the Commission alone-the power to set electric utility rates." (Citation and internal quotation marks in petition omitted.) "By suspending biennial reviews and prohibiting the Commission from changing base rates (except at the utility's request, on a temporary basis, in emergencies)," Old Dominion argued, Code § 56-585.1:1 unconstitutionally "fixes the base rates that a utility will charge its customers for a period well into the future, and deprives the Commission of any power to reduce or otherwise regulate those rates." In other words, "[i]t leaves the Commission utterly powerless to protect customers from unfair and unreasonable base rates, even when the rates are designed to provide significant excess revenues for the utility and its shareholders." By doing so, the statute, in Old Dominion's view, unconstitutionally prohibits the Commission from discharging "its constitutional power and duty."
 

 After Old Dominion filed the petition, VML, comprised of representatives of local governments and other political subdivisions in Virginia located within APCO's service area, and Torrent, a Virginia residential customer of Dominion Power proceeding pro se, among others, filed responses with the Commission in support of Old Dominion, making the same argument that Code § 56-585.1:1 is unconstitutional under Article IX, § 2.
 

 The Attorney General of Virginia, APCO, and Dominion Power filed responses with the Commission opposing Old Dominion's
 petition, arguing that the statute is constitutional.
 
 [3]
 
 These respondents asserted that the plain language of Article IX, § 2 clearly and unambiguously subordinates the Commission's ratemaking authority to limitations established by the General Assembly. They argued that Code § 56-585.1:1 is, indeed, no different in effect than the limitations imposed upon the Commission's ratemaking authority under Code § 56-585.1's biannual regulatory regime-which Old Dominion was in fact seeking in its petition to enforce. They also pointed to other such legislation, emphasizing in particular the General Assembly's deregulation of certain electric utilities in 1999 that capped base rates for seven years. Furthermore, they asserted, this Court's decision
 in
 
 VEPCO
 
 controls. There, this Court held that the subject-to-such-requirements language in Article IX, § 2, clause 3, is "clear and unambiguous" in subordinating the authority of the Commission to regulate electric rates "to the power of the General Assembly to command otherwise."
 
 214 Va. at 465
 
 ,
 
 201 S.E.2d at 777
 
 .
 

 C. Commission's Final Order
 

 Concluding that Code § 56-585.1:1 is constitutional under Article IX, § 2, the Commission issued a final order denying Old Dominion's petition, to which Commissioner Dimitri dissented. The dissent discussed extensively what it views as the statute's negative public policy outcomes. The Commission rejected the public policy arguments against the statute made by Old Dominion, the dissent and others, as immaterial. The Commission focused instead on the purely legal issue of whether Old Dominion had carried its burden of overcoming the presumption in favor of the statute's constitutionality-which the Commission acknowledged is among the strongest presumptions in Virginia law. Thus, its "duty in this case," the Commission explained, "is to decide the legal question of constitutionality without regard to our public-policy preferences and not to conflate the two."
 
 [4]
 

 The Commission reasoned that the temporary base rate freeze under Code § 56-585.1:1 on the base rates it had previously set for
 APCO and Dominion is "not unprecedented and must be considered in light of [this] Court's unequivocal instruction that any alleged unconstitutionality must be clear and palpable and that any reasonable doubt renders the statute constitutionally valid." As such, the Commission determined, this temporary rate base freeze "can reasonably be considered [as falling] within the 'criteria and other requirements' " that may be prescribed by the General Assembly under Article IX, § 2.
 

 The Commission expressly rejected the theory implicit in the arguments made by Old Dominion, the dissent and other proponents of the petition challenging Code § 56-585.1:1 to the effect that Article IX, § 2"grants to the Commission a plenary power to legislate that is both
 
 exclusive of
 
 , and
 
 superior to
 
 , that of the General Assembly. Under this theory, the General Assembly apparently can enact purely
 
 procedural
 
 , but
 
 not substantive
 
 , criteria and requirements, or it can enact some substantive criteria and requirements as long as they don't cross a line, which is neither clearly located or defined." (Emphases in original.) In any event, while under this theory the General Assembly "can 'prescribe' how the Commission regulates rates," it "cannot 'remove' the rate-setting authority." Based on such a test, the Commission explained, numerous ratemaking related legislative enactments prior to Code § 56-585.1:1 would have been unconstitutional-with no limiting principle having been proposed. This would include the 1999 Virginia Electric Utility Restructuring Act's removal of the Commission's authority to set rates for electric utilities in favor of deregulation. That legislation would have been unconstitutional because "the General Assembly could never make the
 
 public policy
 
 decision to deregulate services of the types of companies listed in Article IX, § 2 [i.e., railroad, telephone, gas and electric companies] by removing the Commission's authority to set the rates for such services and thereby allowing prices to be set by the market." (Emphasis in original.)
 

 Eschewing this interpretation of Article IX, § 2, the Commission concluded "[t]here is no historical evidence that those who adopted the 1971 Constitution intended such a grant of plenary policy-making power to the Commission," quoting as support for its conclusion
 
 VEPCO
 
 ,
 
 214 Va. at 465
 
 ,
 
 201 S.E.2d at 777
 
 ("[T]he authority of the [Commission] ... is
 
 subordinate
 
 to the power of
 the General Assembly to command otherwise."), and
 
 Potomac Elec. Power Co. v. State Corp. Comm'n
 
 ,
 
 221 Va. 632
 
 , 636,
 
 272 S.E.2d 214
 
 , 216 (1980) ("The [Commission's] regulatory jurisdiction is
 
 not
 
 plenary."). (Emphasis in Commission's final order.)
 The Commission also recognized that under the logic of Old Dominion's petition many of the provisions of Code § 56-585.1 governing biennial reviews-which the proponents of the petition ultimately seek to enforce-may be unconstitutional. Thus, the Commission deduced, the proponents "would have us return to ground that [their] own argument, if accepted, would render infirm," thereby undermining the logic of their challenge to Code § 56-585.1:1.
 

 II. ANALYSIS
 

 A. Standard of Review
 

 The constitutionality of Code § 56-585.1:1 presents an issue of law subject to de novo review.
 
 Appalachian Power Company
 
 ,
 
 284 Va. at 703
 
 ,
 
 733 S.E.2d at
 
 254 ;
 
 Appalachian Voices v. State Corp. Comm'n
 
 ,
 
 277 Va. 509
 
 , 516,
 
 675 S.E.2d 458
 
 , 461 (2009). We are guided in this review by the fundamental principle that "all actions of the General Assembly are presumed to be constitutional."
 
 Montgomery Cty. v. Virginia Dept. of Rail & Public Trans.
 
 ,
 
 282 Va. 422
 
 , 435,
 
 719 S.E.2d 294
 
 , 300 (2011) (quoting
 
 Copeland v. Todd
 
 ,
 
 282 Va. 183
 
 , 193,
 
 715 S.E.2d 11
 
 , 16 (2011) ). Indeed, there is "no stronger presumption known to the law,"
 

 id.
 

 (collecting cases), and therefore "a heavy burden of proof is thrust upon the party" challenging a statute's constitutionality,
 
 Harrison v. Day
 
 ,
 
 200 Va. 764
 
 , 770,
 
 107 S.E.2d 594
 
 , 598 (1959).
 

 This strong presumption reflects the breadth of legislative power in Virginia. "Unlike the Congress of the United States, the General Assembly of Virginia functions under no grant of power."
 
 Carter v. City of Norfolk
 
 ,
 
 206 Va. 872
 
 , 874,
 
 147 S.E.2d 139
 
 , 141 (1966). The General Assembly, in "represent[ing] the sovereign authority of the people," is restricted only by the Constitution of Virginia "in express terms or by strong implication. We look to the Constitution of the State not for grants of power, but for limitations.... [I]t is a restraining instrument, and ... the General Assembly of the State possesses all legislative power not prohibited
 by the Constitution."
 
 Gallagher v. Commonwealth
 
 ,
 
 284 Va. 444
 
 , 452,
 
 732 S.E.2d 22
 
 , 25-26 (2012) (quoting
 
 Whitlock v. Hawkins
 
 ,
 
 105 Va. 242
 
 , 248,
 
 53 S.E. 401
 
 , 403 (1906) ). In short, "[u]nless forbidden by some State or Federal constitutional provision," the General Assembly's "powers are plenary."
 
 Harrison
 
 ,
 
 200 Va. at 770
 
 ,
 
 107 S.E.2d at 598
 
 .
 

 In deference to this broad legislative authority, we have repeatedly said that a statute will be upheld as constitutional unless it is "plainly repugnant" to some provision of the Virginia or Federal Constitutions.
 
 Elizabeth River Crossings
 
 ,
 
 286 Va. at 301
 
 ,
 
 749 S.E.2d at 183
 
 (quoting
 
 Jamerson v. Womack
 
 ,
 
 244 Va. 506
 
 , 510,
 
 423 S.E.2d 180
 
 , 182 (1992) );
 
 see
 

 Montgomery Cty.
 
 ,
 
 282 Va. at 435
 
 ,
 
 719 S.E.2d at
 
 300 ;
 
 Harrison
 
 ,
 
 200 Va. at 770
 
 ,
 
 107 S.E.2d at
 
 598 ;
 
 Ex parte Settle
 
 ,
 
 114 Va. 715
 
 , 719,
 
 77 S.E. 496
 
 , 497 (1913). In other words, the unconstitutionality of a statute must be "clear and palpable."
 
 Gallagher
 
 ,
 
 284 Va. at 452
 
 ,
 
 732 S.E.2d at 26
 
 (quoting
 
 Whitlock
 
 ,
 
 105 Va. at 248
 
 ,
 
 53 S.E. at
 
 403 ). We are thus compelled to "resolve any reasonable doubt regarding a statute's constitutionality in favor of its validity."
 
 Montgomery Cty.
 
 ,
 
 282 Va. at 435
 
 ,
 
 719 S.E.2d at 300
 
 (quoting
 
 Supinger v. Stakes
 
 ,
 
 255 Va. 198
 
 , 202,
 
 495 S.E.2d 813
 
 , 815 (1998) );
 
 see
 

 Peery v. Virginia Bd. of Funeral Directors,
 

 203 Va. 161
 
 , 165,
 
 123 S.E.2d 94
 
 , 97 (1961) ("To doubt is to affirm.");
 
 Reynolds v. Milk Comm'n of Va.
 
 ,
 
 163 Va. 957
 
 , 966,
 
 179 S.E. 507
 
 , 510 (1935) (same);
 
 Taylor v. Commonwealth
 
 ,
 
 117 Va. 909
 
 , 914,
 
 85 S.E. 499
 
 , 501 (1915) (same).
 

 B. Code § 56-585.1:1 is constitutional under Article IX, § 2
 

 Applying these principles, we agree with the Commission that Old Dominion, with its support from the other appellants, has not overcome the strong presumption that Code § 56-585.1:1 is constitutional under Article IX, § 2. To prevail, the appellants are required to show that Article IX, § 2 prohibits the General Assembly from suspending the Commission's biennial base rate reviews. The Commission's status as a creation of the Constitution of Virginia is not enough, as "[i]t is well established that the [Commission] 'has no inherent power simply because it was created by the Virginia Constitution.' "
 
 Elizabeth River Crossings
 
 ,
 
 286 Va. at 307
 
 ,
 
 749 S.E.2d 176
 
 (quoting
 
 VYVX of Va., Inc. v. Cassell
 
 ,
 
 258 Va. 276
 
 , 290,
 
 519 S.E.2d 124
 
 , 131 (1999) ). There is nothing in Article IX, § 2 that
 clearly indicates that the Commission's authority to set rates displaces or is exclusive of the General Assembly's authority. To the contrary, the prefatory phrase in Article IX, § 2, clause 3, plainly makes the Commission's authority to regulate rates "[s]ubject to such criteria and other requirements as may be prescribed by law."
 

 In the context of the Commission's authority to regulate the rates that electric utility companies charge for services furnished to governmental entities, we concluded in
 
 VEPCO
 
 that the "clear and unambiguous meaning" of the disputed subject-to-such-requirements language is that such authority of the Commission is "subordinate to the power of the General Assembly to command otherwise."
 
 [5]
 

 214 Va. at 465
 
 ,
 
 201 S.E.2d at 777
 
 . We there so construed this language in deciding the constitutionality of Code § 56-234, which provided that the electric rates charged to government entities shall not be regulated by the Commission. Concluding that the General Assembly could so "command" under the plain language of Article IX, § 2, clause 3, we upheld the constitutionality of the statute.
 

 Id.
 

 In doing so, we rejected the argument that "the disputed language simply means that the General Assembly has the right to prescribe a manual of procedure for the [Commission] and not to grant legislative power to
 
 curtail or eliminate
 
 the [Commission's] power and duty with regard to ... particular classes of rates charged by electric utilities."
 
 Id.
 
 at 464,
 
 201 S.E.2d at 776
 
 (internal quotation marks omitted) (emphasis added). Article IX, § 2, we determined, does indeed grant to the General Assembly such broad legislative power over the Commission's authority to regulate the rates charged by electric utility companies.
 
 Id.
 
 at 464-66,
 
 201 S.E.2d at 776-77
 
 . We thus found "no conflict" in the constitutional authority of the Commission to regulate electric rates and the General Assembly's legislative enactment to eliminate that authority in the case of rates charged to governmental entities-given the General Assembly's ultimate authority under Article IX, § 2.
 
 Id.
 
 at 466,
 
 201 S.E.2d at 777
 
 .
 

 In light of this authority of the General Assembly, we have repeatedly stated in other cases since the passage of the 1971 Constitution of Virginia that the Commission's authority to regulate
 the rates of electric utility companies has been "delegated" to it by the General Assembly under various legislative enactments. See
 
 Virginia Elec. & Power Co. v. State Corp. Comm'n
 
 ,
 
 284 Va. 726
 
 , 741,
 
 735 S.E.2d 684
 
 , 691 (2012) ("[W]hen the Commission is conducting a ratemaking procedure, it is exercising a legislative function delegated to it by the General Assembly.");
 
 Potomac Edison Co.
 
 ,
 
 276 Va. at 587
 
 ,
 
 667 S.E.2d at 777
 
 ("[Allegheny Power] was asking the Commission to exercise its ratemaking authority, a legislative function delegated to the Commission by the General Assembly.");
 
 Commonwealth ex rel. Div. of Consumer Counsel v. Potomac Edison Co.
 
 ,
 
 233 Va. 165
 
 , 170-71,
 
 353 S.E.2d 785
 
 , 788 (1987) ("The Commission is an expert tribunal which exercises a legislative function in fixing rates, under powers delegated to it by the General Assembly." (quoting
 
 Old Dominion Power, Co. v. State Corp. Comm'n
 
 ,
 
 228 Va. 528
 
 , 532,
 
 323 S.E.2d 123
 
 , 125 (1984) ));
 
 Appalachian Power Co. v. Commonwealth
 
 ,
 
 216 Va. 617
 
 , 625-26,
 
 221 S.E.2d 872
 
 , 878 (1976) ("[I]n performing the duty of fixing reasonable and just rates for a public service corporation providing heat, light and power service, the Commission exercises a legislative function delegated to it by the General Assembly by Code § 56-235, under Art. IX, § 2 of the Constitution of Virginia.").
 

 Appellants, however, now seek to re-plow the same ground covered in
 
 VEPCO
 
 by arguing that the terms "criteria" and "requirements" in Article IX, § 2, clause 3, mean essentially the same thing, which is to limit the General Assembly's power to setting procedural standards or rules that the Commission must use in exercising its ratemaking authority. But as we explained in
 
 VEPCO
 
 , the "ready and complete answer" dispelling this argument is found in
 Article IX, § 3 of the Constitution of Virginia, providing that "[t]he Commission may prescribe its own rules of practice and procedure not inconsistent with those made by the General Assembly. The General Assembly shall have the power to adopt such rules, to amend, modify, or set aside the Commission's rules, or to substitute rules of its own."
 

 This paragraph from § 3, dealing specifically with the subject of rules of practice and procedure, vests in the General Assembly full and complete power to prescribe such rules or to alter or repeal those which may be promulgated by the [Commission]. It is difficult
 to believe that the General Assembly, in approving this paragraph for submission to the electorate while at the same time adding the [disputed] language to § 2, intended only to accomplish a single end in both instances-the reservation of the right to prescribe rules of procedure. If the language in § 2, "[s]ubject to such criteria and other requirements as may be prescribed by law," means only that the General Assembly may prescribe rules of procedure, then most of the quoted paragraph of § 3 would be completely superfluous, and that cannot be.
 

 VEPCO
 
 ,
 
 214 Va. at 464-65
 
 ,
 
 201 S.E.2d at 776
 
 .
 
 [6]
 
 Indeed, the definition of the term "requirements" in Article IX, § 2, clause 3, embraces more than mere procedure; it is "[s]omething that must be done because of a law or rule; something legally imposed, called for, or demanded; an imperative command." Black's Law Dictionary 1498 (10th ed. 2014). A law suspending the Commission's biennial reviews thus fits comfortably among such "requirements as may be prescribed by law." Va. Const. art. IX, § 2.
 

 The Commission therefore correctly decided that Code § 56-585.1:1 is constitutional because it is not plainly repugnant to Article IX, § 2. We accordingly reject appellants' argument that Article IX, § 2 alters the General Assembly's plenary power to set public policy relative to the regulation of rates of electric utility companies, as it did here in suspending the Commission's biennial base rate reviews of APCO for two cycles with the enactment of Code § 56-585.1:1. In this regard, we recognize that this Court has "no constitutional authority to judge whether a statute is unwise, improper, or inequitable because the legislature, not the judiciary, is the sole author of public policy."
 
 Tvardek v. Powhatan Village Homeowners Ass'n
 
 ,
 
 291 Va. 269
 
 , 279-80,
 
 784 S.E.2d 280
 
 , 285 (2016) (citations and internal quotation marks omitted). Furthermore,
 we reject appellants' argument that our construction of Article IX, § 2 lacks any limiting principle on the power of the General Assembly as relates to setting electric utility rates. The limiting principle in this instance, enshrined in our constitution, is the democratic process to which we certainly must also defer.
 

 III. CONCLUSION
 

 For the foregoing reasons, we affirm the Commission's order dismissing Old Dominion's petition challenging the constitutionality of Code § 56-585.1:1.
 

 Affirmed.
 

 Code § 56-585.1:1(A) provides, in relevant part:
 

 No biennial reviews of the rates, terms, and conditions for any service of a Phase I Utility, as defined in § 56-585.1 [i.e., APCO], shall be conducted at any time by the State Corporation Commission for the four successive 12-month test periods beginning January 1, 2014, and ending December 31, 2017. No biennial reviews of the rates, terms, and conditions for any service of a Phase II Utility, as defined in § 56-585.1 [i.e., Dominion Power], shall be conducted at any time by the State Corporation Commission for the five successive 12-month test periods beginning January 1, 2015, and ending December 31, 2019. Such test periods beginning January 1, 2014, and ending December 31, 2017, for a Phase I Utility, and beginning January 1, 2015, and ending December 31, 2019, for a Phase II Utility, are collectively referred to herein as the "Transitional Rate Period."
 

 For Dominion Power, Code § 56-585.1:1 effected a five-year base rate freeze, in suspending its biennial reviews until 2021.
 

 The Attorney General did so despite having opposed the passage of Code § 56-585.1:1 on policy grounds.
 

 Like the Attorney General, the Commission had opposed the passage of Code § 56-585.1:1 on policy grounds.
 

 That is to say, we so construed the disputed language without the "need [to] resort to extrinsic evidence in the form of legislative debate or contemporaneous construction to supply the meaning."
 
 VEPCO
 
 ,
 
 214 Va. at 464
 
 ,
 
 201 S.E.2d at 776
 
 .
 

 In reference to the addition of the disputed prefatory phrase in Article IX, § 2, clause 3, "[s]ubject to such criteria and other requirements as required by law," this language was not included by the Commission on Constitutional Revision in the proposed draft of Article IX in what became the 1971 Constitution of Virginia. The language was instead added by the General Assembly when it approved the proposed constitution prior to its submission to the electorate.
 
 VEPCO
 
 ,
 
 214 Va. at 463-64
 
 ,
 
 201 S.E.2d at 775-76
 
 .