PRESENT: Mims, Powell, Kelsey, McCullough, and Chafin, JJ., and Russell and Millette, S.JJ.

WAL-MART STORES EAST, LP, ET AL.

OPINION BY
v. Record Nos. 191159 & 191160          JUSTICE D. ARTHUR KELSEY
JULY 9, 2020

STATE CORPORATION COMMISSION, ET AL.

FROM THE STATE CORPORATION COMMISSION

Wal-Mart Stores East, LP and Sam's East, Inc. (collectively, "Walmart") appeal from an order of the State Corporation Commission ("SCC" or "Commission") denying Walmart's petitions filed pursuant to Code § 56-577(A)(4). These petitions sought the Commission's permission to combine the electric-energy demand of separate Walmart locations to qualify to buy electricity from sources other than the incumbent public utilities regulated by the SCC. Walmart concedes that the statute provides the Commission with discretion to grant or deny such requests but contends that the Commission "erred as a matter of law" and "acted arbitrarily and capriciously" by denying Walmart's petitions, Appellants' Br. at 16-17. Walmart also argues that the Commission abused its discretion by denying a motion for reconsideration. Disagreeing with both contentions, we affirm.

I.

Prior to 1999, Virginia operated a vertically integrated, state-regulated monopoly over the generation, transmission, and distribution of electrical power within the Commonwealth. Under this regulatory model, consumers of electrical energy had to purchase it from one of the incumbent public-utility companies regulated by the SCC. *See generally* William T. Reisinger, *Public Utilities Law*, 49 U. Rich. L. Rev. 137, 137-43 (2014). The two largest incumbent public utilities were Virginia Electric and Power Company ("VEPCO") and Appalachian Power Company ("APCO").

"In 1999, the General Assembly enacted the Virginia Electric Utility Restructuring Act, former Code §§ 56-576 et seq., which was designed to deregulate parts of the electric utility industry and introduce competition among the providers of electric generation." *Appalachian Power Co. v. State Corp. Comm'n*, 284 Va. 695, 699 (2012). Under that legislation, at the end of the transition period for deregulation, every retail customer of electrical power, from the largest to the smallest, would be able to shop freely for electrical power from different suppliers. *See* Reisinger, *supra*, at 139.

In 2007, "the General Assembly ended the deregulation program" and "established a new regulatory regime." *Old Dominion Comm. for Fair Util. Rates v. State Corp. Comm'n*, 294 Va. 168, 172 (2017) (discussing 2007 Acts chs. 888, 933, at 2402, 2614); *see also Virginia Elec. & Power Co. v. State Corp. Comm'n*, 295 Va. 256, 263 (2018). The 2007 reregulation legislation authorizes retail choice in three narrow categories. Two of the categories are mandatory, and the third is discretionary. The two categories in which the Commission has no discretion to approve or reject retail choice are (i) large customers with a demand exceeding five megawatts and (ii) all customers seeking 100% renewable energy if the customer's incumbent utility does not offer the same. *See* Code §§ 56-577(A)(3) and (5). The third category, in which the Commission has the discretion to approve or reject retail choice, applies to nonresidential customers that aggregate their demand to exceed five megawatts. That third category is codified in Code § 56-577(A)(4).

In December 2017, Walmart filed two petitions seeking relief under Code § 56-577(A)(4). The first requested the Commission's permission to aggregate Walmart's electricity needs presently supplied by VEPCO and to purchase electricity to meet those needs from other suppliers licensed to sell electrical energy within Virginia. The second petition requested the same relief for Walmart's stores within APCO's service territory.

Code § 56-577(A)(4) gives the SCC the discretion to allow certain nonresidential, retail customers to aggregate their electrical load within an electric utility's service territory for the purpose of participating in the wholesale market for electricity and obtaining more competitive pricing. At the time of the SCC's decision in this case,[1] Code § 56-577(A)(4) stated in pertinent part:

> A. Retail competition for the purchase and sale of electric energy shall be subject to the following provisions:
>
> . . . .
>
> 4. After the expiration or termination of capped rates, two or more individual nonresidential retail customers of electric energy within the Commonwealth, whose individual demand during the most recent calendar year did not exceed five megawatts, may petition the Commission for permission to aggregate or combine their demands, for the purpose of meeting the demand limitations of subdivision 3, so as to become qualified to purchase electric energy from any supplier of electric energy licensed to sell retail electric energy within the Commonwealth under the conditions specified in subdivision 3. The Commission may, after notice and opportunity for hearing, approve such petition if it finds that:
>
> a. Neither such customers' incumbent electric utility nor retail customers of such utility that do not choose to obtain electric energy from alternate suppliers will be adversely affected in a manner contrary to the public interest by granting such petition. In making such determination, the Commission shall take into consideration, without limitation, the impact and effect of any and all other previously approved petitions of like type with respect to such incumbent electric utility; and
>
> b. Approval of such petition is consistent with the public interest.

Walmart's petitions stated that it operates 120 stores in VEPCO's service territory and 44 in APCO's service territory. After an initial notice and comment period, the SCC consolidated

---

[1] The General Assembly amended Code § 56-577, effective July 1, 2019. *See* 2019 Acts ch. 833, at 1958-60 (deleting from subsection (A)(4) the words "[a]fter the expiration or termination of capped rates" and adding a new subdivision (A)(6), which is not applicable here but will affect costs to customers shopping under (A)(3) and (A)(4) who submit aggregation petitions after February 1, 2019). As we discuss later, *see infra* Section II.D., the General Assembly in 2020 further amended the statute effective July 1, 2020. *See* 2020 Acts ch. 796.

the petitions and ordered the parties to present oral arguments on various legal issues surrounding the proper interpretation of Code § 56-577(A)(4). Following oral argument, the SCC clarified the relevant legal issues, ordered a public evidentiary hearing, and appointed a hearing examiner. The hearing examiner subsequently made factual findings, including that the petitions, if granted, would likely increase the monthly bills of remaining, non-shopping customers. VEPCO customers using 1,000 kilowatts of electricity per month would see a total increase of $0.13 in their monthly bills, and similar customers of APCO would see a total monthly increase of $0.05. Acknowledging the SCC staff's finding that this impact was "de minimis," 2 J.A. at 897,[2] the hearing examiner concluded: "The question for the Commission is not whether the impact of granting Walmart's Petitions is de minimis, but rather is whether granting Walmart's Petitions will adversely affect the remaining retail customers . . . in a manner contrary to the public interest," *id.* at 898.

After reviewing the hearing examiner's factual findings and recommendations, the Commission took up the ultimate question of whether granting the petitions would be consistent with the public interest. To this question, Walmart advanced an enticingly simple answer: The statute offers Walmart a way to buy cheaper electricity elsewhere, which necessarily means that when Walmart does so, remaining customers who do not have that option may pay a little more. Even if granting its request would result in de minimis cost shifting, Walmart argued, it seems illogical that this presupposed fact could be the sole reason for denying the statutorily authorized

---

[2] The SCC staff's finding was based upon projections subject to "a multitude of factors that influence both the extent and timing of any rate impact" on remaining customers. 1 J.A. at 481. If the staff's calculations were correct, Walmart contended, a typical residential customer could fully mitigate any potential monetary impact associated with granting Walmart's petitions by replacing a single 100-watt lightbulb with a single 14-watt (100-watt equivalent) light-emitting-diode ("LED") lightbulb. *See id.* at 489-490; 3 *id.* at 1264.

option. Apparently, Walmart's point was that making many customers pay a little more so that a few pay a lot less was a public-policy consequence baked into the very text of Code § 56-577(A)(4).

The Commission disagreed. It began its synthesis of the statutory provisions by distinguishing subsection (A)(4) from subsections (A)(3) and (A)(5). Subsection (A)(3) mandates retail choice for large customers having a demand greater than five megawatts. *See* Code § 56-577(A)(3). Subsection (A)(5) mandates retail choice for customers seeking 100% renewable energy if their incumbent utility does not offer the same. *See* Code § 56-577(A)(5). Customers need no approval from the SCC under either subsection to leave their incumbent utility and shop for electricity outside the state-regulated monopoly.

These subsections, the Commission held, are quite different from subsection (A)(4). Customers satisfying the aggregation criteria of subsection (A)(4) must seek the SCC's permission to buy electricity from competitors of the incumbent utility and must also satisfy two conditions. Even when a customer meets these two conditions, the Commission "may" — not shall — grant permission for the customer to shop for electricity on the open market. *See* Code § 56-577(A)(4).

Using the broadest possible language, the statute requires that granting the petitions be "consistent with the public interest." Code § 56-577(A)(4)(b). This delegation of power, the Commission concluded, presupposes that it may consider various discretionary factors in determining what would be consistent with the public interest. Interpreting the General Assembly's intent in this way, the Commission rejected Walmart's view that subsection (A)(4) required the SCC to approve the petitions because, as a matter of law, the Commission could

5

never deem the petitions inconsistent with the public interest when the only adverse impact of granting the petitions was a de minimis increase in cost for the remaining customers.

Applying a broad view of its delegated discretion, the Commission implicitly accepted the SCC staff's conclusion (noted but not expressly adopted by the hearing examiner) that the petitions, if granted, would have a de minimis impact on the remaining 1,000-kilowatt customers by increasing their monthly bills from VEPCO by $0.13 and from APCO by $0.05. The Commission, however, concluded that the "remaining customers would *not* be held harmless" because granting the petitions could shift up to $65 million of costs to VEPCO's customers over the next ten years and approximately $4 million of costs to APCO's customers over the same period. *See* 2 J.A. at 998 (emphasis in original).

Relying on projections from the SCC staff, the Commission found that the loss of Walmart's load would "cause a net increase in rate adjustment clause ('RAC') rates" for remaining customers and increase base rates more than would be necessary otherwise. *See id.* The SCC staff had also testified that the loss of Walmart's load could lower earned returns for the utility, thereby decreasing the funds available for customer refunds or credits.[3] All of these possible outcomes, the Commission concluded, would adversely affect remaining customers in a manner contrary to the public interest — the first of the two essential criteria that the petitions had to satisfy under Code § 56-577(A)(4).[4]

---

[3] The Commission recognized the possibility of load growth but gave it little weight because "the reallocation of costs among remaining customers" would occur regardless of whether load growth had occurred. *See* 2 J.A. at 998-99. The Commission also noted several possible factors that would require cost recovery regardless of load growth, including environmental-compliance costs for pre-existing power plants, legislative mandates for renewable energy, and continuing federal and state regulations governing carbon emissions. *See id.* at 999.

[4] The Commission noted that VEPCO and APCO explained how they would be adversely affected by granting Walmart's petitions. "As a result of the other findings herein," the

6

The Commission next turned to the second (and more abstract) criterion — whether "[a]pproval of such petition[s] is consistent with the public interest," Code § 56-577(A)(4)(b). Repeating its earlier finding that remaining customers would be adversely affected, the Commission determined "that the harm to customers who do not (or cannot) switch to [another service provider] is contrary to the public interest." 2 J.A. at 999. The Commission then turned its attention to the historic trends, noting that "since the enactment of Code § 56-577(A)(4) in 2007, residential customers of [APCO] and [VEPCO] had seen monthly bill increases of approximately $48 (a 73% increase) and $26 (a 29% increase), respectively." 2 J.A. at 1000. Recent legislative mandates regarding renewable generation, grid transformation, underground distribution, and energy-efficiency spending could induce future increases in VEPCO's rates. *Id.* at 1001. VEPCO will also incur additional revenue losses due to statutorily mandated rate discounts for certain large manufacturing and commercial customers, and it will likely shift costs to residential and small-business customers as a result. *Id.*

Taking a panoramic view of these existing and foreseeable contingencies, the Commission summarized the fundamental rationale for its decision to deny Walmart's petitions under Code § 56-577(A)(4):

> In conclusion, given the context of a decade of rising rates and the likelihood of even higher rates in the future, we do not find it consistent with the public interest for captive customers who do not have the legal ability to obtain lower rates — predominantly residential and small business — to suffer from the cost-shifting identified herein by enabling a large-demand customer to seek its power supply elsewhere through aggregation.

2 J.A. at 1003.

---

Commission stated, "we need not decide whether such effects are contrary to the public interest." *Id.* at 998 n.16.

Walmart filed a petition for reconsideration, asking the Commission to consider a scaled-down request for aggregation. The Commission denied the petition, finding that the request for a lesser aggregation was "clearly different from the specific relief sought by Walmart in its original petitions." *Id.* at 1041-42. It did not matter that testimony at the evidentiary hearing had suggested that Walmart "would aggregate a smaller amount of load if that was the only thing that was available." *Id.* at 1042 (citation omitted). "This testimony obviously does not serve to amend Walmart's originally-filed petitions," the Commission held, and Walmart did not "seek to amend its petitions at any point during these proceedings to modify its requests for relief herein." *Id.*

Walmart appealed the denial of both petitions to this Court. After the parties had presented oral argument in these appeals, the General Assembly enacted House Bill 889, entitled "An Act to direct the establishment of a pilot program relating to electric utility regulation and retail competition pursuant to § 56-577 of the Code of Virginia," *see* 2020 Acts ch. 796. The Governor has signed the enrolled bill, which took effect on July 1, 2020. At the end of our opinion, we will address the effect, if any, this new legislation has on these appeals.

II.

On appeal, Walmart asserts various assignments of error relying on two main premises. We start with Walmart's first premise — that the Commission denied Walmart's petitions based on an understanding of "public interest" that is out of sync with the legislative policies implicit in Code § 56-577(A)(4). Next, we address the secondary premise that the factual record was insufficient even under the purportedly flawed legal rationale adopted by the Commission. While both assertions raise serious concerns, they ultimately cannot prevail given the General Assembly's broad delegation of decision-making discretion to the Commission under Code § 56-

8

577(A)(4) concerning decisions that implicate the "public interest" and the facts that inform them.

A.

Beginning with the public-interest standard, Walmart reasons that subsection (A)(4)(a) must be first understood contextually and then textually. The context of Code § 56-577(A)(4), Walmart argues, presupposes that it is in the public's interest to create and protect — not to ban and discourage — retail choice for aggregating customers and to grant them the freedom to participate in the wholesale market for their electricity needs. Thus, under Walmart's view, the public-policy thumb on the scale weighs in favor of retail choice unless such choice would adversely affect the incumbent utility or its remaining customers "in a manner contrary to the public interest," Code § 56-577(A)(4)(a).

The public interest cannot be offended, Walmart continues, if the adverse effect is simply recasting the marginal-cost savings enjoyed by the benefitted party into higher marginal costs to remaining customers or lost revenue to the incumbent utility. After all, that benefit-burden calibration will be present in every case, and under this flawed view, the Commission would never grant petitions under subsection (A)(4). Such an interpretation would be akin to a judge saying, "I have authority to continue a case unless a party is prejudiced, but any delay (however de minimis) is always prejudicial."

Walmart's argument is a tightly constructed syllogism, and it might be persuasive if subsection (A)(4)(a) were the only relevant statutory language informing us of the General Assembly's intent. But it is not. Subsection (A)(4)(a) is immediately followed by subsection (A)(4)(b)'s general reference to the "public interest," and both subsections are preceded by the highly permissive "may" language governing the ultimate scope of the Commission's discretion.

9

*See* Code § 56-577(A)(4). It is hard to imagine a broader grant of discretionary authority: The Commission "*may*" — not "shall" or "must" or "should" — grant a petition if doing so, in the Commission's opinion, will not harm others "in a manner contrary to the public interest" and would be "consistent with the public interest." *See* Code §§ 56-577(A)(4)(a) and (b) (emphasis added). Read literally, the "may" command is hardly a command at all.[5] "May" presupposes that the Commission also "may not," and the invocation of "the public interest" implies a highly subjective value judgment that the Commission "may" adopt.

We are not tempted to repurpose "may" as a polite form of "shall." Although the may-shall conundrum may be deeply embedded in the vocabulary of law, *see* 1A Norman J. Singer & J.D. Shambie Singer, Sutherland's Statutes and Statutory Construction § 21:8, at 172 (7th ed. 2009) (lamenting the "[i]naccurate use of the forms 'may' and 'shall'"), we continue to "'presume that the legislature chose, with care, the' specific words of the statute" and that "[t]he act of choosing carefully some words necessarily implies others are omitted with equal care," *Rickman v. Commonwealth*, 294 Va. 531, 540 n.3 (2017) (citation omitted).

These interpretative presumptions find a strong foothold in subsection (A)(4)(a), which specifically includes an explicit "shall" command. Subsection (A)(4)(a) specifies the one thing that the Commission "shall take into consideration" (previously approved petitions) and then

---

[5] *See, e.g.*, *Board of Supervisors v. State Corp. Comm'n*, 292 Va. 444, 454 (2016) (explaining that "in construing statutes this Court 'will apply the ordinary meaning of the word "may,"' which is '"permission, importing discretion"'" (citation omitted)); *AME Fin. Corp. v. Kiritsis*, 281 Va. 384, 392 (2011) (explaining that "the use of the word 'may,' as opposed to 'shall,' in Rule 3:19(b) evidences that even after a defendant shows good cause, a trial court has discretion to grant or refuse the defendant's motion"); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 112 (2012) (explaining that "[t]he traditional, commonly repeated rule is that *shall* is mandatory and *may* is permissive"); 3 J.D. Shambie Singer, Sutherland's Statutes and Statutory Construction § 57:10, at 64 (8th ed. 2020) ("[T]he word 'may' ordinarily does not connote a command, but instead imports permissive conduct and confers discretion.").

clarifies that doing so shall be "without limitation" to other circumstances relevant to the public interest. *See* Code § 56-577(A)(4)(a). The statute itself thus distinguishes between "shall" and "may." The Commission "shall" consider one thing among others and, after considering the public interest, "may" grant the petition. "When the General Assembly employs a specific word [shall] in one section of a statute, and chooses a different term [may] in another section of the statute, we must presume the difference in language was intentional." *Jordan v. Commonwealth*, 295 Va. 70, 75 (2018); *see also* 3 Singer, *supra* note 5, § 57:11, at 77 ("Where a legislature uses both mandatory and directory verbs in the same statute, section, paragraph, or sentence, it is fair to assume it was aware of the difference and intended each verb to carry its ordinary meaning.").

We believe that the General Assembly intended both the structure and specific wording of Code § 56-577(A)(4) to delegate wide discretion to the Commission over the question whether to grant or deny retail-choice petitions. Walmart correctly argues that this delegation of discretionary power does not authorize the Commission to declare retail choice as contrary to the public interest in *all* circumstances and thereby defy the express statutory recognition of retail choice as an exception to the general rule. But we disagree with Walmart's contention that the Commission went that far in this case.

Instead, the Commission examined the benefit-burden equation in the larger context in which it plays itself out. After looking back on "a decade of rising rates," the Commission projected a "likelihood of even higher rates in the future" due to a series of recent legislative and regulatory changes. *See* 2 J.A. at 1003. In this escalating-cost environment, the Commission concluded, the public interest would not be served by requiring "captive customers" (predominantly residences and small businesses) to absorb the cost shifting that would accompany the retail-choice options that Walmart had requested. *Id.* We cannot disregard this

11

decision as a "protest" by the Commission against the General Assembly's policy judgments, as Walmart suggests, *see* Appellants' Br. at 43. The statute does not imply, much less expressly state, that the Commission should not consider the trending trajectory of utility rates when deciding whether it *may* or *may not* grant a petition for retail choice under Code § 56-577(A)(4).

Despite its ostensible complexity, this case boils down to a simple conclusion: The Commission believed that now is not a good time to grant these petitions. The fundamental legal question, which we answer in the affirmative, is whether the General Assembly intended to delegate such broad discretion to the Commission. The expansive language of Code § 56-577(A)(4) suggests that the Commission, as it does with its ratemaking function, "is exercising a legislative function delegated to it by the General Assembly," *Old Dominion Comm. for Fair Util. Rates*, 294 Va. at 180 (citation omitted). Here, as in other contexts, we "presume that where the General Assembly has not placed an express limitation in a statutory grant of authority, it intended for the Commission, as an expert body, to exercise sound discretion." *City of Alexandria v. State Corp. Comm'n*, 296 Va. 79, 94 (2018) (quoting *Virginia Elec. & Power Co. v. State Corp. Comm'n*, 284 Va. 726, 741 (2012)).

Before leaving this subject, we must add a qualification. In reaching the conclusion that the Commission interpreted Code § 56-577(A)(4) correctly, we take into account that the Commission's decisions are "entitled to the respect due judgments of a tribunal informed by experience," *City of Alexandria*, 296 Va. at 93 (quoting *Virginia Elec. & Power Co.*, 284 Va. at 735-36). That well-deserved respect, however, does not weaken our duty to "review questions of law de novo," *id.* "Although the SCC's statutory construction 'is entitled to the respect due judgments of a tribunal informed by experience,' we are 'not inextricably bound' by it and 'will not hesitate to reverse' it if we find that it 'is based on a mistake of law.'" *Id.* (citations omitted).

12

In short, we interpret Code § 56-577(A)(4) broadly because its text and context require that we do so. Our de novo interpretation respects, but does not in lockstep adopt, the Commission's position on this pure question of law.

B.

Walmart also challenges much of the Commission's factfinding, arguing not that it was proven to be inaccurate, but rather that it was based upon speculative assumptions. Walmart wages its main attack along these lines: "At best, the evidence established that customers *could be* adversely impacted, not that they would be." Appellants' Br. at 19 (emphasis in original). Framed this way, Walmart's argument is a challenge to the sufficiency of the evidence — the point being that the SCC's evidence was insufficient to prove that the remaining customers would in fact suffer adverse impacts to the degree claimed. Most, if not all, of Walmart's other evidentiary arguments follow this pattern.

An argument that the evidence was insufficient, however, can only be made against (not by) the party with the burden of proof. A prosecutor, for example, cannot complain that an accused failed to prove his innocence any more than a car-wreck plaintiff can claim that the defendant failed to prove his exemplary driving. This conclusion is true even if the defendant, in either the criminal or civil context, produces speculative evidence or no evidence at all. Even when the evidence is in equipoise, when measured by the level of certitude required by the burden of proof, the party with that burden necessarily suffers the loss. *See, e.g.*, *In re: Brown*, 295 Va. 202, 228 (2018); *Orchard Glen E., Inc. v. Board of Supervisors*, 254 Va. 307, 313 (1997); *Riley v. Harris*, 211 Va. 359, 362 (1970); *Anderson v. Sisson*, 170 Va. 178, 186-87 (1938).

13

Walmart's factual insufficiency argument thus inverts the burden of proof. Code § 56-577(A)(4) authorizes customers to file petitions seeking "permission" from the Commission to be exempted from the general rule, codified in Code § 56-577(A)(3), requiring all customers with a demand under 5 megawatts to purchase their electricity from the incumbent electric utility of the customer's service territory. As "the party seeking to disturb the status quo," *see* Charles E. Friend & Kent Sinclair, The Law of Evidence in Virginia § 5-2[a], at 317 (8th ed. 2018), a petitioner seeking relief under the exception in (A)(4) must shoulder a three-tiered burden of persuasion. The petitioner must first persuade the Commission by a preponderance of the evidence that the petitioner's factual assertions are true. The petitioner must then persuade the Commission that those proven facts satisfy the public-interest requirements of Code § 56-577(A)(4). Having proved the factual predicates for the public-interest requirements, the petitioner must convince the Commission to exercise its may-approve (not shall-approve) discretion to grant the relief requested.

At no point in this sequence is the Commission or its staff considered a party. *See* 5 VAC § 5-20-80(D) (stating that the SCC staff "may appear and participate" in the proceedings but are not collectively "considered a party to the case . . . by virtue of participation in a proceeding"). It necessarily follows that the Commission has no burden of proof.[6] When correctly reframed, the only factual challenge that Walmart can make on appeal is the sufficiency argument applicable to all cases in this context: that no rational factfinder could reasonably be

---

[6] Proceedings initiated by petition under Code § 56-577(A)(4) must be distinguished from "[i]nvestigative, disciplinary, penal, and other adjudicatory proceedings" that are "initiated by motion of the commission staff or upon the commission's own motion." *See* 5 VAC § 5-20-90(A). In the latter set of proceedings, the "commission staff shall prove the case by clear and convincing evidence." *Id.*

14

*unpersuaded* by Walmart's factual assertions. This argument ends in the present case almost as quickly as it begins.

Walmart claims that the Commission relied on speculative "possibilities" when it found that granting the petitions would adversely impact remaining non-shopping customers. *See* Appellants' Br. at 18-19. Walmart then faults the Commission for not relying on Walmart's own evidence of *potential* net benefits to remaining customers. *See id.* at 22-25. Walmart also points specifically to the anticipated load growth for VEPCO and APCO that will absorb the loss of Walmart's load and offset the cost shifting. *See id*. at 26-28.

Walmart's assertions, however, do "little more than show that the parties' experts disagreed, which does not render the Commission's findings contrary to the evidence," *City of Alexandria*, 296 Va. at 102 (citing *BASF Corp. v. State Corp. Comm'n*, 289 Va. 375, 397 (2015)). "The Commission is entitled to interpret the conflicting evidence and to decide the weight to afford it." *Id*. (alterations omitted) (quoting *Board of Supervisors v. State Corp. Comm'n*, 292 Va. 444, 458 (2016)). The Commission did just that when it weighed the evidence regarding load growth and concluded that cost shifting would occur regardless of whether load growth occurred, *see* 2 J.A. at 998-99. The Commission was also entitled to rely on the SCC staff, various other experts, and the recommendations of the hearing examiner when it drew conclusions about total cost shifting, monthly bill increases, net increases in rate-adjustment clauses, and decreased available funds for customer credits, *see id.* at 998. The same can be said of the Commission's lack of confidence in Walmart's evidence regarding potential net benefits to remaining customers. These determinations involve fine distinctions in evidentiary weight and a considerable amount of educated prognostication about future conditions. Such matters are for the Commission, not this Court, to decide. "We cannot sit as a board of revision to substitute

15

our judgment for that of matters within the province of the Commission." *City of Alexandria*, 296 Va. at 103 (quoting *Virginia Gas Distribution Corp. v. Washington Gas Light Co.*, 201 Va. 370, 375 (1959)).

Finally, Walmart argues that the Commission erred in finding that it was not "consistent with the public interest for captive customers who do not have the legal ability to obtain lower rates — predominantly residential and small business — to suffer from the cost-shifting identified herein." Appellants' Br. at 40 (quoting 2 J.A. at 1003). There is no such thing as a captive customer, Walmart contends, because all customers can "pursue retail choice" under Code § 56-577(A)(5), which allows customers to shop for 100% renewable energy regardless of demand size. *See* Appellants' Br. at 40.

In context, however, the Commission was saying something far less broad than Walmart suggests. The "vast majority of customers," the Commission clarified, do not have the same opportunity as larger customers "to shop for *solely* lower prices." 2 J.A. at 999 n.19 (emphasis added). That "solely" qualification is surely true. The limited opportunity to shop for 100% renewable energy[7] is not the same as the carte blanche right to "shop for solely lower prices," *id.* The reference to captive customers, therefore, provides no support for Walmart's challenge to the Commission's final order.

---

[7] Unlike subsection (A)(4), subsection (A)(5) allows a customer to shop for 100% renewable energy only if its incumbent utility "does not offer an approved tariff for electric energy provided 100 percent from renewable energy." *See* Code § 56-577(A)(5)(a). At the time of the Commission's ruling in this case, APCO had an approved renewable-energy tariff. *See* Appellants' Br. at 40-41 (citing *In re Appalachian Power Co.*, Case No. PUR-2017-00179, 2019 WL 157450 (S.C.C. Jan. 7, 2019)). VEPCO has applied for approval of a similar tariff and presently awaits a final decision by the Commission. *See In re Virginia Elec. & Power Co.*, Case No. PUR-2019-00094, 2019 WL 2576543 (S.C.C. June 20, 2019); *see also* Code § 12.1-26 (providing that the "findings, decisions, and judgments" of the Commission "shall be made public"); Va. R. Evid. 2:203 (allowing courts to take judicial notice "of all official publications of . . . agencies required to be published pursuant to the laws thereof").

C.

After receiving an unfavorable decision from the Commission, Walmart filed a motion to reconsider, arguing that the Commission had failed to consider whether a smaller amount of aggregation would, in the Commission's view, be consistent with the public interest. At the prior evidentiary hearing, a Walmart witness had stated on cross-examination that Walmart "would aggregate a smaller amount of load if that was the only thing that was available." 3 J.A. at 1238-39. The Commission should reconsider its decision to reject the petitions, Walmart contended, in order to determine what, if any, "smaller amount" of load might be consistent with the public interest. *See id.* In response, the Commission stated that the ambiguous remark during the hearing about a "smaller amount" was "clearly different from the specific relief sought by Walmart in its original petitions," and Walmart never sought to amend its petitions to "modify its requests for relief." *See* 2 *id.* at 1041-42.

The Commission did not abuse its discretion in denying the motion to reconsider. A motion to reconsider ordinarily asks a court to reconsider a holding because, in the opinion of the movant, the holding was erroneous. *See* Black's Law Dictionary 1218 (11th ed. 2019). Walmart's motion to reconsider did not ask the Commission to reconsider its holding denying Walmart's request for permission to aggregate the load of a specific number of customers. Instead, Walmart argued that the Commission should consider "whether authorizing some load less than Walmart requested in its Aggregation Petitions would satisfy" Code § 56-577(A)(4). 2 J.A. at 1036. That is not a request to reconsider a prior decision. It is a request to consider for the first time something the movant had never before specifically sought. Indeed, Walmart admitted as much. *See id.* at 1004 (seeking, on rehearing, relief for a load different than "the total load sought in Walmart's above-captioned petitions").

17

It is true that a motion to reconsider may also challenge a tribunal's failure to rule on an issue properly presented to it, particularly a timely but unadjudicated lesser-included claim. But that is not the situation here. Walmart's petitions specifically sought to aggregate 120 customers totaling 70.52 megawatts of load, *see* 1 J.A. at 1-4, and 44 customers totaling 20.57 megawatts of load, *see id.* at 12-15. This specific request was the basis of all aspects of the evidentiary record, including the SCC staff's analytics and recommendations, the hearing examiner's factfinding, and the Commission's ultimate decision. The single statement by a single Walmart witness was insufficient notice of an alternative, lesser-included request for relief.

We do not mean to suggest that the Commission had no discretion to grant the motion to reconsider. It did. *See* 5 VAC § 5-20-120(C) (authorizing the Commission to "accept, modify, or reject the hearing examiner's recommendations in any manner consistent with law and the evidence"). We review the Commission's decision to deny the motion to reconsider under an abuse-of-discretion standard. "The abuse of discretion standard draws a line — or rather, demarcates a region — between the unsupportable and the merely mistaken, between the legal error . . . that a reviewing court may always correct, and the simple disagreement that, on this standard, it may not." *Reyes v. Commonwealth*, 297 Va. 133, 139 (2019) (citation omitted). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred," *Du v. Commonwealth*, 292 Va. 555, 564 (2016) (citation omitted), because only then does a discretionary decision exceed the "outermost limits of the range of choice available," *Reyes*, 297 Va. at 140. Viewed under this deferential standard, the Commission did not abuse its discretion in denying Walmart's motion to reconsider.

18

D.

As noted above, the General Assembly recently enacted House Bill 889, entitled "An Act to direct the establishment of a pilot program relating to electric utility regulation and retail competition pursuant to § 56-577 of the Code of Virginia," 2020 Acts ch. 796.  Having taken effect on July 1, 2020, this statute requires the Commission to "conduct a pilot program" for nonresidential customers who previously filed aggregation petitions (prior to February 25, 2019). *Id.*  These petitioners, which would include Walmart, "shall be permitted to purchase electric energy from any supplier of electric energy licensed to sell electric energy within the Commonwealth" under certain specified conditions.  *See id.*  The pilot program, however, is limited to "the certified service territory of the Phase II Utility in which such nonresidential customers are located."  *Id.*  VEPCO is a Phase II Utility.[8]  APCO is not.  The pilot program is subject to "review" by the Commission in 2022.  *Id.*

This new statutory development has no effect on Walmart's ability to purchase electricity for its stores within APCO's service territory, but it may directly affect Walmart's ability to purchase electricity for its stores within VEPCO's service territory — at least for the duration of the pilot program.  What we do not know, however, is the expected duration of the pilot program, the nature of the SCC's review in 2022, or the reasonableness of any expectation that Walmart may have of remaining in the program.  No evidence or argument of any kind has been offered on these subjects.

---

[8] A "Phase II Utility" is an investor-owned, incumbent electrical utility that was, as of July 1, 1999, bound by a rate-case settlement adopted by the Commission that extended in its application beyond January 1, 2002.  *See* 2020 Acts ch. 796 (adopting the definition of "Phase II Utility" from Code § 56-585.1(A)).

19

By contrast, a petition granted under Code § 56-577(A)(4) has no statutorily fixed end date. An approved petition is subject to review and revocation "[i]f the Commission finds, after notice and opportunity for hearing, that such group of customers no longer meets the above demand limitations." Code § 56-577(A)(4)(b). If the Commission makes this finding, the Commission "may revoke its previous approval of the petition, or take such other actions as may be consistent with the public interest." *Id.* For our purposes, it is unnecessary to determine the precise nature of Walmart's expectancy interest in an approved petition under Code § 56-577(A)(4) because the pilot program legislation does not repeal or alter a petitioner's opportunity to file a Code § 56-577(A)(4) petition.

Given the uncertainty surrounding the nature and duration of the upcoming pilot program, we decline to deem as moot Walmart's petition under Code § 56-577(A)(4) seeking retail choice within VEPCO's service territory. The factual record and legal arguments are ripe for a judicial disposition, and the recently enacted pilot program does not clearly moot our duty to declare the legal rights of the parties under Code § 56-577(A)(4). *See Chaffins v. Atlantic Coast Pipeline, LLC*, 293 Va. 564, 571 (2017).

### III.

Because the Commission exercised its delegated discretion in a manner consistent with its statutory authority under Code § 56-577(A)(4), we affirm the Commission's order denying Walmart's petitions.

*Affirmed.*